## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID MACDONALD,

                   Plaintiff,

v.

UNITED PARCEL SERVICE,

                   Defendant.

_____/

CASE NO. 07-12022

HON. MARIANNE O. BATTANI


### OPINION AND ORDER GRANTING DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant's Motion for Summary Judgment (Doc. No. 50). United Parcel Service (UPS) maintains that the claims brought by its former employee, Plaintiff David MacDonald, under the Michigan Whistleblowers Protection Act (WPA), the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), the Elliott-Larsen Civil Rights Act ("ELCRA"), and retaliation under the PWDCRA and ELCRA fail as a matter of law. For the reasons that follow, Defendant's Motion is **GRANTED**.

### I.    STATEMENT OF FACTS

UPS hired MacDonald, in February 1973. He eventually became a feeder driver, a position he held for 18 years. As a feeder driver, MacDonald drove tractor trailers from the Taylor Center to the UPS hub in Grand Rapids. Def.'s Ex. 3 at 234.

In January 2005, Plaintiff was involved in an auto accident in which he sustained a closed head injury. He did not work for several months after the accident. P.'s Ex. B. After MacDonald returned to work, he informed his supervisor, Jeff Bowen, that the accident caused memory problems. Pl.'s Ex. 15, MacDonald Dep. at 131-32. A year later,

the facts giving rise to this lawsuit unfolded.

As part of UPS's effort to ensure compliance with federal standards, it employs an outside consultant, KETER Consulting, to conduct unannounced audits at randomly selected UPS facilities. The audit includes testing of feeder drivers on "Safety Information", which included the 5 Seeing Habits and the 10 Point Commentary. The UPS Comprehensive Health and Safety Process Department ("CHSP") also conducts unannounced internal audits, asking employees the same questions asked on KETER Audits. During a KETER Audit, feeder drivers are required to recite from memory the 5 Seeing Habits and explain three of the 10 Point Commentary. Def.'s Ex. 3, 3-4, 25, 31-32, 83-85, 117-18.

UPS does not limit its testing to these audits; it tests drivers on safety information in a variety of ways. Drivers take written tests on a monthly basis. Def.'s Ex. 5, Gaffney Dep. at 105-06. Drivers also are spot-checked and asked to recite the Safety Information. Id. at 109-11. When a driver does not do well on the random test, a supervisor follows-up.

On April 11 and 12, 2006, the Metro Detroit District CHSP Director, Trish Spangler, conducted an internal audit at the Taylor Center, which included an interview of MacDonald. Id. at 36. Spangler asked MacDonald the 5 Seeing Habits and the 10 Point Commentary. Id. at 75. Although the 5 Seeing Habits had been in effect for at least 25 years, Def.'s Ex. 5, Gaffney Dep. at 94, and Plaintiff had known the rules before the accident, Pl.'s Ex. 15 at 103, he was unable to pass the internal audit.

Because MacDonald performed poorly, Kathy Kernohan, the Feeder Manager, instructed him to study UPS Safety Information every work day. She subsequently told

MacDonald that during his "Central Sort" time in Grand Rapids, he needed to study safety rules.  Pl.'s Ex. 15, MacDonald Dep. at 143-44.  The Central Sort time is downtime, during which employees take their lunch and break and are free to socialize, play cards, or sleep while their truck is loaded.  MacDonald was required to be alone and study.  P.'s Ex. 6.  Aff. of Norman Whala at ¶ 7.  Kernohan also told him that Bowen would work with Plaintiff on April 17, and that on April 28, MacDonald would be required to recite the rules.

On April 17, 2006, while Bowen rode with MacDonald to Grand Rapids to help him learn the safety information, MacDonald told Bowen he was suffering from the effects of his car accident and had difficulty remembering.  MacDonald additionally stated the recitation was not necessary because he was a safe driver.  Bowen sent a memo to Kathy Kernohan the following day, informing her of the conversation.  See Ex. Def.'s Ex. 15.

On April 21, 2006, UPS terminated MacDonald for his failure to learn work rules. According to UPS, MacDonald was reading the newspaper during Central Sort time instead of studying work rules.  According to Plaintiff, he merely hid his study materials in a newspaper to conceal what he was doing.  MacDonald filed a grievance, and the termination was reduced to a thirty-day suspension.  Def.'s Ex. 3 at 156, Pl.'s Ex. 15 at 154, 155.  The union advised Plaintiff to cooperate with management regarding the safety rules.  He returned to work in May.

In September 2006, management called MacDonald to a meeting and asked him to recite the work rules.  Again, MacDonald was unable to recite the safety rules.  During the meeting, Plaintiff stated that he had written documentation from his doctor that he had memorization problems stemming from his car accident.  Specifically, on May 15, 2006, Plaintiff's doctor, confirmed that MacDonald experienced "some problems with short-term

3

memory." Pl.'s Ex. D. Management responded that it was not there to discuss Plaintiff's medical condition.

After the meeting, MacDonald called Tom Hooper, UPS's Employee Concerns Manager, and asked to be allowed to carry a pocket-sized card listing the safety rules. Pl.'s Ex. 15 at 106-08. Following the conversation, MacDonald wrote to HR and asked for an accommodation as to the memorization requirement. Pl.'s Ex. F. MacDonald informed Hooper that he was being harassed because of his disability. Pl.'s Ex. 12, Hooper Dep. at 49-51, 57. Hooper forwarded the accommodation request to the Corporate Health and Safety Manager, Mary Breen, and to HR in Detroit. Id., at 61-62, 70-71. Breen suggested MacDonald get the necessary paperwork for an accommodation and submit it to Corporate. Pl.'s Ex. G.

On the same day, September 18, 2006, UPS issued MacDonald a Notice of Termination for failing to follow management's instructions to learn the required information. MacDonald again filed a grievance challenging the notice of termination. In his grievance he states, "My employer UPS continues to discriminate, intimidate, harass, coerce, and overly supervise me, with no consideration of my age and physical condition." Pl.'s Ex. H. Again the termination was rescinded, effective October 16, 2006. Defendant sent a letter clarifying that Plaintiff was to continue studying the safety rules and that he would be required to write the rules during his Central Sort time. Def.'s Ex. 19.

While the grievance procedure was ongoing, UPS was considering Plaintiff's request for an accommodation. According to a September 28, 2006, file memo, Diana Dargan, a company nurse contacted MacDonald about his ADA request. She informed

4

him that she would send a medical form for his physician to complete regarding his short-term memory problems, that she would forward the completed form for review, and that the process could take several weeks.  Pl.'s Ex. I.

On October 5, 2006, Dr. Atto confirmed that MacDonald had trouble reciting information under pressure and requested an accommodation on Plaintiff's behalf.  Pl.'s Ex. 7 at 12-13, Pl.'s Ex. 7, Atto Dep. at 13.  In his deposition, Dr. Atto stated that he "did a mini mental test exam on [Plaintiff] and he was normal, but when he is trying to memorize these things, he was not able to" do so.  Id.

On December 6, 2006, Bowen quizzed Plaintiff on the safety rules.  Def.'s Ex. 21. MacDonald showed little improvement.  According to Bowen's memo, sent to Kernohan's replacement, Pat Gaffney, Bowen asked Plaintiff for his written work, which MacDonald provided only after Bowen promised to copy the work.  Plaintiff requested the originals; Bowen insisted that the originals were company property.  Bowen also counted the pages to verify the count.  Id., Pl.'s Ex. 15.

The following day, MacDonald called the Taylor police and reported that the property had been stolen.  Def.'s Ex. 22.  According to MacDonald, the police officer told Alice Tkachuk, the Taylor Center Manager, to be sure that the notebook was returned to MacDonald when he returned to work.  The affidavit of Walter Howell, the officer dispatched to UPS, shows that Howell did not consider the matter to be a police matter, but a private matter between MacDonald and his supervisor.  Id.  Howell did not make out an incident report.  Id.

The following day, MacDonald contacted Hooper in Atlanta regarding the events.

Pl.'s Ex. 12 at 83.  UPS management did conduct an investigation into the incident.

Within a week of the incident, UPS began surveillance of MacDonald.  UPS Security Superior, Phil Siegel, was instructed to follow and watch MacDonald while Plaintiff was in Grand Rapids.  Siegel stated that Gaffney told him UPS needed documentation to institute discipline against MacDonald.  Pl.'s Ex. 17, Siegel Dep. at 66-67.

On December 18, 2006, MacDonald filed two grievances.  In his first, he asked for an award of $500,000 for UPS management's disregard of his rights.  Specifically, he claimed management continued "to intimidate, harass, coerce and overly supervise" him. He added that he had not been treated with "dignity and respect" or due consideration "to his age and physical condition."  Pl.'s Ex. L.  In his second grievance, he asserted that Bowen stole his personal property.  Pl.'s Ex. L.

On January 3, 2007, UPS denied Plaintiff's request for an accommodation.  Pl.'s Ex. M.   UPS was "unable to conclude [Plaintiff] was eligible for a reasonable accommodation."  Id.

On January 11, 2007, Bowen and another supervisor followed MacDonald as he drove to Grand Rapids.  They observed several work rule violations--MacDonald made an unauthorized stop, there were large unaccounted gaps in his time, and he was grossly insubordinate.   On January 19, 2006, UPS issued a Notice of Discharge for violation of work rules.  Specifically, Plaintiff purchased a coke while on a bathroom break and failed to put his hazmat pouch in the proper location when he left his truck.  He was charged with dishonesty and other serious offenses.  Pl.'s Ex. O.  Plaintiff contacted HR in Atlanta and

6

requested an investigation.  Pl.'s Ex. P. at 12

On January 25, 2007, Bowen rode with MacDonald to Grand Rapids, and according to Plaintiff, subjected him to abusive criticism.  MacDonald asserts Bowen wrote a self-serving memo about their ride to justify MacDonald's termination.  Pl.'s Ex. 14.  For example, Bowen demanded Plaintiff put on a fluorescent safety vest, threw it at MacDonald, and told him to wear it all day. MacDonald questioned the order, but did try to put on the vest, which did not fit and fell apart.  Bowen then told MacDonald not to bother.  Pl.'s Ex. 15 at 173-92.  Plaintiff adds that Bowen yelled at MacDonald for topping off his washer fluid, told MacDonald to get his "old ass up in the truck" and then Bowen drove erratically and unsafely.  Bowen refused to stop for a restroom break when asked until MacDonald pleaded, refused to let MacDonald make a telephone call, and refused to leave the heat on in the truck.

On January 26, 2007, MacDonald was taken out of service and fired two days later. Pl.'s Ex. R.  The termination letter, dated January 28, 2007, provides several reasons for the termination:  MacDonald was grossly insubordinate, he failed to follow management's instructions, and he violated workplace violence and prevention policy.  Id.  The termination decision was made by Gaffney and Chuck Schmidbauer, the Metro-Detroit Labor Manger.  Def.'s Ex. 5 at 269.

UPS replaced MacDonald with a younger driver, Gary Vinnay, who had been employed by UPS since 1978. Ex. 5.  Vinnay was the fill-in feeder driver.

In Count I of his complaint, which advances a claim under the Michigan's Whistleblowers Protection Act (WPA), Plaintiff asserts that he was terminated in retaliation

for his reporting the theft of his property by Bowen.  In Count II of his complaint, he alleging he was terminated in violation of the PWDCRA, when UPS forced him to memorize safety rules unrelated to the performance of his essential job functions.  In Count III, Plaintiff alleges he was terminated because of his age.  Finally, Plaintiff alleges his employer retaliated against him in violation of state anti-discrimination laws.

## II.    STANDARD OF REVIEW

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  In other words, the movant must show that it would prevail on the issue even if all factual disputes are conceded to the nonmovant. Additionally, for the purposes of deciding on a motion for summary judgment, a court must draw all inferences from those facts in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  ANALYSIS

Plaintiff advances discrimination claims based on age and disability as well as retaliation claims arising out of his discrimination claims.  He also alleges that his termination was in violation of the WPA.  Each claim is discussed below.

## A. DISCRIMINATION CLAIMS

A plaintiff can prove a discrimination claim through direct or circumstantial evidence. Direct evidence of discrimination is evidence "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Hazle v. Ford Motor Co., 628 N.W.2d 515 (Mich. 2001) (quotation omitted). In cases involving indirect or circumstantial evidence, a plaintiff must proceed by using the burden-shifting approach set forth in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). Specifically, in the absence of direct evidence of discrimination, a plaintiff bringing a claim under the ELCRA, must show the following elements: 1) he is a member of a protected class; 2) suffered an adverse employment action; 3) was qualified for the position; and 4) lost the position to another individual under circumstances that infer unlawful discrimination. Hazle, 628 N.W.2d at 521.

Once these elements have been satisfied, the burden falls to the employer to show a legitimate and nondiscriminatory reason for the adverse employment action. In order to determine if a reason for an adverse action is legitimate and nondiscriminatory, the court cannot question the "soundness" of the employment decision or whether the court finds it to be a "wise, shrewd, prudent, or competent" decision. Hazle, 628 N.W.2d at 522. The court limits its focus to whether the decision was motivated by a discriminatory intent. Id.

If the employer meets this burden, the plaintiff must prove that the proffered reason for the action was a mere pretext for unlawful discrimination. Sniecinski v. BCBS of Michigan, 666 N.W.2d 186, 193 (Mich. 2003). The plaintiff must then present evidence "sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." Lytle

9

v. Malady, 579 N.W.2d 906, 916 (Mich. 1998).  Michigan courts have held that a plaintiff must offer evidence, beyond his own assertion of discrimination, which supports his claim that the employer's proffered reason is a pretext.  A plaintiff's claim that he was "a victim of . . . discrimination is not enough, in itself, to take the case to jury." Bouwman v. Chrysler Corp., 319 N.W.2d 621, 626 (Mich. Ct. App. 1982).

### 1.  Age Discrimination

#### a. Prima facie case

#### i. Direct evidence

According to MacDonald, when he returned to work after his accident a manager asked him if, at his age, he should be returning.  Pl.'s Ex. 15, MacDonald Dep. at 347. Moreover, prior to his termination, Bowen made comments about MacDonald not moving fast enough, and on other occasions had asked MacDonald about retirement.

For purposes of analyzing this claim, the Court assumes that Bowen told MacDonald to move his old ass; that between 2005 and 2007, Bowen asked MacDonald on several occasions when he was going to retire; that in August 2006, after MacDonald told a retiring employee that he wished it was him, another supervisor, Alice Tkachuk, told MacDonald that she also wished it was MacDonald that was retiring; and that in late 2006, Gaffney asked MacDonald when he was going to retire.

Although this evidence may be relevant to the issue of whether Defendant discriminated against Plaintiff because of his age, questioning a plaintiff about his retirement plans does not compel the conclusion that age discrimination occurred.  Neff v. Petoskey Pub. Sch., No. 236287, 2003 WL 1698215 (Mich.  App.  March 27, 2003)

10

(supervisor asking about retirement plans during interview did not constitute direct evidence of discrimination).  The Court's approach in evaluating the relevancy of the evidence is flexible.  For example, in Ercegovich v. Goodyear, 154 F.3d 344, 357 (6th Cir. 1998) (citation omitted), the appellate court stated, "[T]he courts must carefully evaluate factors affecting the statement's probative value, such as 'the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action."  Accordingly, the Court directs its attention to the nature of the inquiries and the context in which they were made.  Accord  Leonard v. Twin Towers, No. 99-4221, 2001 WL 223854 at * 5 (6th Cir. March 1, 2001).

Bowen's remark, which contains a direct comment about Plaintiff's age--old--may be offensive.  In does not constitute direct evidence of age discrimination, and given the circumstances, it creates no inference of age bias.  MacDonald is only three years older than Bowen; the age differential minimizes any inference that Bowen has an ageist predisposition.

In addition, although Bowen provided information to the decisionmaker, which played a part in the termination decision, Bowen did not make the decision to terminate MacDonald.  Moreover, the remark was not made contemporaneously with the termination. Most importantly, the comment, which at best is ambiguous, does not support Plaintiff's claim.  According to MacDonald's own testimony, Bowen made the comment while they were riding together in the truck.  Bowen already had commented on the fact that he always beat MacDonald into the truck.  Pl.'s Ex. 15 at 77-78.  In addition,

MacDonald testified that he was frequently subjected to criticism because he was slow. Specifically, Defendant told Plaintiff that his inspections took too much time, as did his bathroom breaks.  Id. at 348-49.  The record shows that management believed that MacDonald was stalling his arrival to Grand Rapids to minimize his study time.  Given the identity of the speaker as well as the content of the speech, there is no basis for concluding that Bowen's remark reflects age-related bias.

The same analysis applies to retirement comments by Tkachuk, who was not involved in the discharge decision.  Her comment about retirement is at best ambiguous; reasons other than age animus could motivate her desire that MacDonald retire. According to UPS, these remarks are stray remarks, too irrelevant to support a finding of age discrimination.  This Court agrees.  This is not a case where repeated and unwelcome questions about MacDonald's retirement occurred.

The Court finds no direct evidence of discrimination based on these comments, which were made prior to the final termination decision.  It therefore analyzes Plaintiff's claim under the shifting burden analysis.

### ii. Circumstantial evidence

The first two elements necessary to establish a claim under the ELCRA are not in dispute.  The parties dispute the issue of Plaintiff's qualifications and whether he can show he was replaced by a younger driver.

Defendant argues that Plaintiff is not qualified for the position because UPS expects its drivers to be safe.  The Court rejects this argument.  MacDonald held the feeder driver position for 18 years and was performing his job duties satisfactorily.  He won a safe

12

driving award three times.  He never had an accident while working.  He meets his burden to show he was qualified.[1]

Next, UPS argues that Plaintiff fails to establish a prima facie case because MacDonald was replaced by Vinnay, admittedly a younger driver, because Vinnay got the job pursuant to the CBA.  Consequently, UPS did not select Plaintiff's replacement.   In Mlinaric v. Parker Hannaflin Corp., 853 F.2d 927 (6th Cir. 1988), the court relied on the selection requirement of the collective bargaining agreement as a basis for concluding that a plaintiff failed to make his prima facie case.  In contrast, in Laughlin v. United Telephone Southest, 1997 U.S. App. LEXIS 3822 (6th Cir. Feb. 27, 1997), the court found such evidence satisfied the defendant's burden on the pretext prong of the shifting burden test.  In this case, Plaintiff contends that UPS knew that Vinnay was next in line because a supervisor asked Vinnay if he was ready to replace Plaintiff.  Although Plaintiff testified that Vinnay told him about this before final termination occurred, Vinnay contradicts this assertion.  Because there is a dispute as to whether Defendant knew who would be replacing Plaintiff, the Court considers the better approach to be that articulated in Laughlin.  Accordingly, it finds this evidence is better considered when analyzing the issue of pretext.

Because the Court finds Plaintiff has made a prima facie case, Defendant must

---

[1]In the alternative, Defendant asserts that MacDonald made insubordinate comments and left his hazardous materials documents on his seat when he left his vehicle, that he took longer than the allotted time to perform scheduled tasks and made a purchase while not on a scheduled break.  The Court finds these facts are better considered in the analysis of whether Defendant treated him differently in terminating his employment on these grounds.

advance a nondiscriminatory reason for Plaintiff's termination.   UPS claims that it terminated Plaintiff for violations of work and safety rules.   Accordingly, the burden shifts to Plaintiff, who must demonstrate that the reason offered by UPS was a pretext for discrimination.

To the extent that Plaintiff maintains discrimination motivated the discharge, the Court finds the evidence unavailing.  Even if Bowen actually commented on the slow pace with which Plaintiff completed his tasks, there is no dispute that the comments were made during the time Defendant believed Plaintiff was delaying his arrival at Grand Rapids to reduce the amount of time he had to study.  No inference of discrimination arises from these comments.

In the alternative, Plaintiff maintains the reasons given for his discharge are unworthy of credence, and do not pass the "straight face test."  Pl.'s brief at 21.  The January 27, 2007, Memo from Jeff Bowen to Pat Gaffney, characterized MacDonald's conduct as gross insubordination, failure to follow management instructions," and concludes that MacDonald is not "working in the company's best interest."  Pl.'s Ex. Q. The notice of suspension states that UPS's investigation showed that Plaintiff was "grossly insubordinate, failed to follow management's instructions and that [his] actions were in direct violation of the Workplace Violence and Prevention Policy.  Pl.'s Ex. R.  Plaintiff asserts that Bowen fabricated many of the facts contained in the memo Bowen sent to Gaffney.  For example, Plaintiff contends he was not insubordinate and did not hit Bowen with the vest.  There is no suggestion that the decisionmakers were aware that Bowen's memo contained false information.   There is no dispute that Gaffney conducted a

14

grievance investigation. Finally, there is no evidence presented that Gaffney had reason to doubt Bowen's version of the events.

In challenging whether the reasons are believable or actually motivated Defendant's actions, Plaintiff also observes that he was terminated because he purchased a soda at a truck stop, left a hazmat pouch on his dashboard rather than the passenger seat, asked management if the ride in the package car that was following his truck was comfortable, threw a safety vest at Bowen, filed his washer fluid after being told not to, and cursed at Bowen. He contends that these actions alone are insufficient to prompt his termination.

The Court declines to view these activities individually or in isolation of the events that unfolded beginning in April 2006. Although Plaintiff was given a notice of termination in April 2006 for reading the newspaper when he was supposed to be studying, the termination was reduced to a suspension. Although he was given a second notice of termination in September 2006, for not reciting safety information after months of study, the termination was rescinded, and he was given different instructions to aid his memorization of the material. There is insufficient evidence linking his January 2007 termination to his age or disability.

In addition, MacDonald attempts to cast doubt on the bases of his termination by providing affidavits from other drivers, who regularly stopped for drinks or who could not recite safety rules verbatim. To prove that the reasons provided by a defendant are pretextual and that age is a determining factor, a plaintiff can show that he was treated differently than similarly situated employees.

Here, the evidence does not satisfy Plaintiff's burden, and Plaintiff's reliance is

15

misplaced.  To establish a question of fact relative to pretext, a plaintiff must prove that the employees are similar in "all of the relevant respects."  <u>Ercegovich</u>, 154 F3d at 352. Factors to consider are whether the comparables  "dealt with the same supervisor, have been subject to the same standards and have engaged in some conduct without such differentiating or mitigating circumstances that would distinguish their conduct of the employer's treatment of them for it." <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992) (imposing a more rigorous standard that the employee and comparable coworkers be nearly identical).  <u>Accord</u> <u>Town v. Michigan Bell Telephone Co.</u>, 568 N.W.2d 64 (Mich. 1997).

No employee testified that Bowen looked the other way when such conduct occurred.  Instead, they testified that they had engaged in similar conduct--for example, stopping for drinks or being late to Grand Rapids.  No one testified that he was unable to recite any of the 5 Seeing Habits, merely that he was unable to recite them verbatim. Further, such conduct was not coupled with insubordination.  <u>See</u> <u>e.g.</u> Pl.'s Exs. 2-6. Plaintiff offers nothing more than speculation from other employees that he was treated differently or that rules were enforced selectively because of his age.  The testimony did indicate that rules were enforced selectively if an employee was not prompt or his production was down.  <u>Id.</u>  Selective enforcement on that basis is immaterial to Plaintiff's claim.

Here, Plaintiff was the only feeder driver at the Taylor Center, and no other driver reporting to Gaffney scored as poorly as Plaintiff during the auditing.  MacDonald was unable to recite safety information more than nine months later, despite the opportunity

16

to study on the job.  Defendant suspected that MacDonald was sabotaging management's efforts to assist him with learning the information.  There is no evidence cited by Plaintiff that individuals engaged in the same conduct as Plaintiff were treated less harshly.  Proving similarity of circumstance is a necessary element of establishing a genuine issue of material fact that the similarly situated employees outside the class were treated differently, and without it, Plaintiff's claim cannot succeed n showing his termination was pretextual.  In sum, Plaintiff cannot establish a case of unlawful age discrimination as a matter of law.

### B.  Disability discrimination

The Persons With Disabilities Civil Rights Act guarantees individuals the "opportunity to obtain employment. . .  without discrimination because of a disability. . . ." MICH. COMP. LAWS § 37.1102(1).  To breathe life into this guarantee, § 37.1102(2) of the PWDCRA requires employers to "accommodate a person with a disability," subject to specified limitations.  Id.

Plaintiff's claim under the PWDCRA is analyzed under the same standards as a claim under the American With Disabilities Act.  Fritz v. Mascotech Automotive Sys. Group, Inc., 914 F.Supp. 1481, 1491 (E.D. Mich. 1996); Chmielewski v. Xermac, Inc., 508 N.W.2d 817, 821 (Mich. 1998).  The Michigan PWDCRA is substantially identical to the ADA, and Michigan courts rely on ADA decisions in resolving claims under the state law. See Smith v. Chrysler Corp., 155 F.3d 799, 804 (6th Cir. 1998).

To state a claim of disability discrimination, a plaintiff must show that he is a disabled person within the meaning of the statute; that he is qualified with or without a

reasonable accommodation to perform the essential functions of his job; and that he was discriminated against because of his disability. Chiles v. Machine Shop, Inc., 606 N.W.2d 398 (Mich. Ct. App. 2000). Under the statute, a person is disabled if he has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual;" and the qualifying impairment is unrelated to the job qualifications. Id.

In this case the parties dispute whether Plaintiff can satisfy the definition of a disabled person within the meaning of the statute.[2] The resolution of the dispute turns on whether short-term memory loss substantially limits a major life activity. Thinking is not listed as a major life activity in the ADA, and the Sixth Circuit has not classified thinking as a major life activity. Hill v. Metro. Gov't of Nashville, 54 Fed.Appx. 199, 201 (6th Cir. 2002) (expressing doubt that thinking is a major life activity). The Court is aware that ADA Amendments Act of 2008, effective January 1, 2009, added thinking to the list of major life activities. See Pub.L. No. 110-325, § 122 Stat. 3553, 3559 (2008). The amendments play no role in the analysis, however, because a court applies the ADA law in place at the time the conduct complained of occurred. Verhoff v. Time Warner Cable, Inc., 299 Fed. Appx. 199 (6th Cir. 2008) (noting that the legislative history of the ADA Amendments Act contains "no statement in the congressional record relating to the retroactive effect of the Act or the Act's application to pending cases," and concluding it is not to be applied

---

[2]In addition, Defendant maintains Plaintiff cannot show it knew Plaintiff had a disability. Here, Plaintiff testified that he did inform several supervisors that he had a closed head injury, provided information that it impacted his short-term memory, and requested an accommodation. Therefore, the Court rejects Defendant's argument that it lacked notice.

retroactively).

Accordingly, the Court finds no legal authority to support Plaintiff's assertion that his short-term memory loss is an impairment that limits a major life activity.  Therefore, his claim fails to satisfy the first criteria:  that he is a disabled person within the meaning of the statute.

Even the inclusion of thinking as a major life activity does not salvage Plaintiff's claim because MacDonald cannot establish his disability substantially limited his thinking.  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999) ("[M]ost objections about the broadness of thinking as a life activity can be captured in the analysis of when the activity is substantially limited.").  The term "substantially limits," is not defined by state statute or the ADA.  42 U.S.C. § 12101-12213. The Equal Employment Opportunity Commission (EEOC), however, has defined "substantially limited" as meaning " '[u]nable to perform a major life activity that the average person in the general population can perform' "; or " '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.' " Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002) (quoting 29 C.F.R. § 1630.2(j) (2001)); see Black v. Roadway Express, Inc., 297 F.3d 445, 447 (6th Cir. 2002).

In Williams, the United States Supreme Court added that substantial "suggests 'considerable' or 'to a large degree,' " Id.  It defined "substantially limited" as "an impairment that prevents or severely restricts [an] individual from [engaging in a major life

19

activity]." Id. (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (2001)). The Williams Court continued: "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection. . .to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience. . .is substantial." Williams, 534 U.S. at 198 (quotation omitted).

That evidence is lacking. MacDonald's evidence suggests that he has some problems with memory and particularly with memorization, but his problem does not rise to the level of a substantial impairment. He has a diagnosis of closed head injury. Pl.'s Ex. 7., Ex. B. In a memo dated May 15, 2006, Dr. Atto described Plaintiff as "experiencing some problem with short term memory." Pl.'s Ex. D.

Memorization is not an activity of central importance to MacDonald's daily life or the daily lives of most people. He is unable to recite, upon command, the UPS Safety information. The testimony of his family shows he is forgetful, and family members have to repeat information. MacDonald forgets to let the dog in after he lets the dog out. He has forgotten a granddaughter's birthday and other special occasions. He forgets to pick up items at the store, and forgets to take his medicine. His wife testified that MacDonald could not "hold" the rules in his mind. This evidence does not demonstrate any significant variation in his ability to memorize with that of the general population, and the medical information presented to his employer suggested that his memory problem fell far short of a substantial limitation. His own doctor characterized his short-term memory problem as mild. Consequently, there is insufficient evidence upon which a jury could conclude

20

that the impact of Plaintiff's memory deficiency is so substantial as to constitute a disability under the PWDCRA.  Accord EEOC v. Sara Lee Corp., 237 F.3d 349, 352-353 (4th Cir. 2001) (considering whether memory loss constitutes a substantial impairment under the ADA and rejecting the claim that occasional forgetfulness and the need to write notes present a substantial limitation of a major life activity).  In Van Compernolle v. City of Zeeland, 2006 WL 1460035 (W.D. Mich. May 24, 2006), the court observed that the ability to concentrate is not a major life activity within the ADA.  In rejecting the plaintiff police officer's claim that his ADD/ADHD was a disability, the court further noted that the evidence showed nothing more than a moderate impairment.  The evidence of impairment advanced by the plaintiff in Van Compernolle is similar in scope to the evidence presented by MacDonald.  The impairment merely rendered some of the plaintiff's job duties more difficult.  Accord Felton v. Eyemart Express, Inc., 241 F.Supp.2d 935, 943 (E. D. Wis. 1993) (noting that "[m]emory lapses, impulsiveness, and poor decision-making are commonplace for the average person; if they constituted disabilities, the ADA would have to be interpreted broadly, not strictly as the Supreme Court now requires").

Based on the foregoing, the Court finds Defendant is entitled to judgment as a matter of law on Plaintiff's disability discrimination claim. He cannot show he is disabled under the statute.

In the alternative, Plaintiff argues that UPS perceived him as disabled.  Plaintiff contends that sarcastic and demeaning comments by Bowen about whether he had to lock Plaintiff's truck in case he did not know how, and Kernohan's e-mail that MacDonald was trying to learn the rules show UPS regarded him as disabled.  This minimal evidence does

not meet Plaintiff's burden.

The Supreme Court discussed at length the factors essential to a perceived disability case in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999). It delineated two ways in which a claimant could meet his burden under the statute: "(1) a covered entity mistakenly believes that a person has an impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Id. at 489.

To fall within the "regarded as" definition, Plaintiff must proffer evidence from which a jury could reasonably infer that his employer believed, however erroneously, that he suffered from an impairment that if it truly existed would be covered under the statute and that the employer discriminated against him on that basis. It is not enough to show that the employer was aware of the disability. Further, even if Plaintiff could marshal evidence creating an inference that UPS regarded him as having a disability, he must first demonstrate his memory loss qualifies under the ADA. "In other words, showing that an employer thought that a plaintiff was somehow impaired is not enough; rather, a plaintiff must adduce evidence that a defendant regarded the plaintiff as having an impairment that substantially limited a major life activity-just as with an actual disability." Chiles, 606 N.W.2d at 407. This he cannot do. Accordingly, the claim fails as a matter of law.

### C. Retaliation Claims

In Count IV of his Complaint, MacDonald alleges that Defendant retaliated against him because he made complaints of age and disability discrimination. Plaintiff claims that he was harassed because he complained to HR in Atlanta about his treatment. Plaintiff

22

contends that he was terminated in retaliation for filing a grievance about his age and physical condition.

To state a claim for retaliation under the ELCRA or PWDCRA a plaintiff must establish that: 1) he engaged in a protected activity; 2) the protected activity was known by the defendant; 3) the defendant took an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse action. Barrett v. Kirtland Comm. Coll., 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).

### 1.  Protected activity

Even before his auto accident, Plaintiff made a claim that he had been treated without dignity or respect and explicitly states that management's treatment violates the American With Disabilities Act.  Def.'s Ex. 54.  In his grievance, MacDonald asserts that he is "constantly being harassed" and that he is "not being treated with dignity and respect by feeder [management]."  He asks that the employer treat him with "dignity and respect at all times, including age and physical condition."  Id.

Although Plaintiff raised similar concerns about his treatment in subsequent grievances, he never contends that the treatment violates a state or federal law.  For example on September 27, 2006, he stated that "UPS continues to discriminate, intimidate, harass, coerce and overly supervise me, with no consideration of my age and physical condition. " Def.'s Ex. 52.   On December 18, 2006, Plaintiff filed two grievances, one essentially repeated the complaints raised in the September 27, 2006, grievance. According to MacDonald, UPS "does not give due consideration to my age and physical condition."  Def.'s Ex. 56.

23

Although an employee need not specifically cite the statute when opposing a violation under the act, the employee "must do more than generally assert unfair treatment." Garg v. Macomb County Cmty Mental Health Serv., 696 N.W.2d 646 (Mich. 2005). Even reading Plaintiff's internal grievances broadly, the Court finds that they do not raise complaints of any conduct that violated the ELCRA. First, his 2004 grievance demonstrates that he knew how to lodge such a complaint. In contrast to the earlier grievance, Plaintiff's 2006 grievances assert unfair treatment, because he did not receive special consideration warranted by his age or disability. He does not allege that he was treated differently because of his age and disability, he alleges he should have been. Due to this failure, Plaintiff cannot maintain a claim for retaliation.

Even if the Court were to find that these grievances are protected activity, Plaintiff cannot show a causal connection between the activity and the disciplinary action against him.

### 2. Causal connection

Although Plaintiff speculates that he was terminated in response to his grievances, there is insufficient evidence to establish a genuine issue of material fact. At the outset, the Court observes that there is no legal prohibition against terminating an employee for violating company policy, even if the employee has filed a discrimination claim. Wroblewski v. City of Saline, No. 12302003, 2003 WL 23104246 (Mich. Ct. App. Dec. 30, 2003). Here, MacDonald first complained about how management treated him and specifically identified the ADA more than two years before he was terminated and before he suffered a closed head injury. This grievance is too remote in time and factually unrelated to his current claim of disability to establish a causal connection.

24

His September 2006 grievance was filed after UPS issued a Notice of Termination, and approximate four months before his Notice of Discharge.  It too fails given the passage of time before the filing and his termination.

The December 2006 grievance, however, was filed a month before the final Notice of Discharge.  Nevertheless, to establish the fourth element of his retaliation claim, "[s]omething more than a temporal connection between protected conduct and an adverse employment action is required."  West v. Gen. Motors, 665 N.W.2d 468, 473 (Mich. 2003).  A plaintiff must demonstrate "more than merely a coincidence in time between protected activity and adverse employment action."  Id.  Additionally, "the fact that an adverse employment action temporally follows the filing of a complaint . . . does not establish causation." Rey v. Oakland County Sheriff's Dept., No. 265123, 2006 WL 1044311, at *2 (Mich. Ct. App. Apr. 20, 2006).

The record shows that UPS attempted to terminate Plaintiff before he filed any of his 2006 grievances.  UPS disciplined MacDonald in April 2006, before he filed a grievance about his treatment.  UPS continued to discipline MacDonald based on his failure to follow work rules and comply with management's directive to study and learn the safety rules.  Because UPS raised concerns with MacDonald's conduct prior to any "protected activity" an inference of causation does not arise.

### D.  Whistleblower Protection Act (WPA) Claim

Plaintiff's WPA claim rests on his allegation that he was terminated because he filed a police report after Bowen stole his personal property.  "To establish a prima facie case under the WPA, plaintiff must show that (1) he was engaged in a protected activity as

25

defined by the Act, (2) the defendant discharged him, and (3) a causal connection existed between the protected activity and the discharge." Roulston v. Tendercare (Michigan), Inc., 608 N.W.2d 525, 529 (Mich. Ct. App. 2000).  The WPA protects an employee from repercussions following his revelation of illegal activity by his employer.[3]  It is a remedial statute and is construed liberally in favor of employees who are willing to risk adverse employment consequences as a result of whistle blowing activities.  Dolan v. Cont'l Airlines/Cont'l Express, 563 N.W.2d 23, 26 ( Mich. 1997).

Defendant maintains that Plaintiff's WPA claim fails because he cannot show that his primary motivation in filing the police report was his "desire to inform the public on matters of public concern."  Shallal v. Catholic Social Servs., 566 N.W.2d 571, 579 (Mich. 1997) (citation omitted).  It concludes that in the absence of this motivation, MacDonald cannot establish a causal connection between his actions and his firing.

Here, it is undisputed that Plaintiff merely wanted his papers returned.  This is confirmed by the police officer who investigated the complaint.  Consequently, Plaintiff

---

[3]  An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

MICH. COMP. LAWS § 15.362.

pursued his own interest in filing the police report.  Although to some extent allowing Plaintiff to proceed raises a disgruntled employee's private dispute with an employer to a whistle blowing event, MacDonald's conduct falls within the conduct protected by the statute.  The objective of the WPA to protect workers who engage in specified activity, including violations of the law.

That protection is not extended to a worker who files a claim in bad faith or uses the WPA to threaten his employer.  Accord Melchi v. Burns Intern. Sec. Services, Inc., 597 F.Supp. 575 (E.D. Mich. 1984) (holding that "employees must not be permitted to use the statute (the Michigan Whistleblowers Act) in a purely offensive manner by reporting violations known to be false").  Here, there is no evidence that vindictiveness played a role in MacDonald's decision to report the theft.  In Phinney v. Perlmutter, 564 N.W.2d 532 (Mich. Ct. App. 1997) (plaintiff, a research scientist, reported that her supervisor stole her research), the appellate court rejected the notion that larceny is not "a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body."  Accord Dudewicz, supra, at p. 75, 503 N.W.2d 645 (WPA not limited to violations of laws closely connected with the employment setting).  Because there is no evidence of bad faith on Plaintiff's part, the Court rejects Defendant's argument that his activity is not protected.

The viability of Plaintiff's claim turns on his ability to show a causal connection between his filing the police report and his termination.  A plaintiff may use circumstantial evidence such as temporal proximity to establish a causal connection. Temporal proximity is insufficient to establish causation standing alone; however, it creates an inference,

which, if supported by other evidence, is sufficient for a finding of causation.

Plaintiff points to the fact that UPS initiated surveillance on him within a week of the police report, something UPS more typically does when it suspects an employee of theft. This fact certainly suggests UPS wanted documentation to fire MacDonald. Nevertheless, the sequence of events undermines any causal connection. Robert Pellicer, Corporate Security Manager, asserts that he was contacted in November 2006, before MacDonald's contact with police, by UPS management and instructed to initiate surveillance on MacDonald. Def.'s Reply, Ex. 2 at ¶ 4. Pellicer assigned the task to Phil Siegel, id. at ¶ 5, who initiated the task after his vacation ended. The record in this case shows that Defendant sought to terminate Plaintiff for his failure to learn the safety rules months before his final termination. In both April and September of 2006, UPS unsuccessfully sought termination based on Plaintiff's inability to recite the safety rules. Plaintiff again failed a rules quiz the day before the dispute over his property. In his December 7, 2006, memo to Gaffney, Bowen contends that he gave Plaintiff two pads of paper and two pens on October 25 and instructed him to write the safety rules as many times as possible during Central Sort. Def.'s Ex. J. Bowen indicates that MacDonald had not performed well on a December 5, 2006, quiz of the safety rules, despite 27 days spent writing the rules. Id. In addition to the physical surveillance of Plaintiff, UPS subsequently installed equipment to observe MacDonald while he was using his Central Sort time to study. Def.'s Ex. J.

The logical inference flowing from the evidence in this record is that Defendant gave Plaintiff a notice of termination because he failed to learn the required safety rules and

resisted Defendant's efforts to assist him in learning the rules.  There is no evidence that Plaintiff's report of theft to the police led to his job loss.

## IV.    CONCLUSION

Based on the foregoing, the Court finds Plaintiff lacks sufficient evidence to create a genuine issue of material fact as to any of his claims.  Accordingly, the Court **GRANTS** Defendant's motion.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Date:  June 5, 2009

## CERTIFICATE OF SERVICE

Copies of this Order were mailed and/or electronically filed to counsel of record on this date.

s/Bernadette M. Thebolt
Deputy Clerk

29